**Jamshid MODY, Plaintiff,**

v.

**CITY OF HOBOKEN, et al.,
Defendants.**

Civ. A. No. 89–1672.

United States District Court,
D. New Jersey.

March 6, 1991.

Matthew Kiffin, Joseph Cooney, Widman & Cooney, Ocean, N.J., for defendant, City of Hoboken.

Michael Dermody, De Leonardis, McGovern & Dermody, Jersey City, N.J., for defendant, Thomas Cahill.

Joseph Healy, Jersey City, N.J., for defendant, George Crimmins.

Jerramiah Healy, Jersey City, N.J., for defendant, Martin Kiely.

Judith Katz, Marguilies, Wind, Herrington & Katz, Jersey City, N.J., for plaintiff, Jamshid R. Mody.

## OPINION

SAROKIN, District Judge.

This damages action under 42 U.S.C. §§ 1983 and 1985(3) arises out of the assault and eventual death of Navroze Mody, a Jersey City, New Jersey resident of Indian descent. Plaintiff, the administrator of the estate of Mr. Mody, alleges that the city of Hoboken and certain municipal employee defendants violated Mr. Mody's constitutional rights by failing to arrest, detain, or file criminal complaints against some individuals involved in his assault after another attack by some of the same individuals against residents of Indian and Pakistani descent. Defendants, the city of Hoboken, Hoboken Police Chief George Crimmins, Police Lieutenant Martin Kiely, and Police Detective Thomas Cahill, move for summary judgment, pursuant to Fed.R. Civ.P. 56. For the reasons set forth below, this court denies defendants' motion.

## INTRODUCTION

Plaintiff alleges the existence of a policy which permits a minority group, in this case Indians, to be harassed and intimidated without subjecting the assailants to prosecution. Even with knowledge of such harassment, a municipality cannot be expected, nor is it required, to provide physical protection to every member of such class who might become a victim of the harassment. However, the failure to prosecute known and identified perpetrators of such conduct may condone the discrimination and embolden its participants.

Plaintiff contends that the very persons who killed the decedent, having committed earlier acts of violence against Indians, and having been identified and not prosecuted, were permitted to attack decedent with impunity. The failure to prosecute under such circumstances can constitute a clear and distinct statement of policy.

The laws which create liability in such circumstances emerged in response to the recognized failure by local government officials to afford to all citizens the equal protection to which they are entitled. *See Monroe v. Pape,* 365 U.S. 167, 174–75, 81 S.Ct. 473, 477–78, 5 L.Ed.2d 492 (1961) (quoting Cong. Globe, 42d Cong., 1st Sess.). An express or implied policy which permits or condones attacks upon members of a particular minority group is the very evil which the post-Civil War statutes sought to eradicate. If law enforcement turns away from a victim solely because of the victim's race, religion, or national origin, equal protection of the laws is rendered meaningless.

The existence of a discriminatory policy, acts done in reliance upon that policy, and injury (in this case death) resulting from it, creates a viable cause of action. Whether such a policy existed and whether plaintiff's decedent was injured as a direct result of it are questions of fact which a jury must resolve.

## BACKGROUND

Because on a summary judgment motion the record must be viewed in the light most

favorable to the nonmoving party, *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970), the court presents plaintiff's version of the facts. In August and September 1987, members of the Hoboken police department were or should have been aware that persons of Asian Indian, Pakistani, or Bangladeshi ("Indian") descent had been the victims of random violence, mostly at the hands of local teenagers. Local television news programs and newspaper articles had covered racially motivated attacks on Indians, and the *Jersey Journal* had received a letter from a group of people calling themselves the "Dot Busters" which threatened more violent acts against Indians.

In September and August, 1987, fifty Indian families were living in the 800 block of Park Avenue in Hoboken. At some time prior to the two incidents discussed in plaintiff's complaint, a group of Puerto Rican youths entered a building at 815 Park Avenue and attacked Indians who were strangers to them. One of Mr. Mody's assailants, Luis Acevedo, had also recently been investigated in an apparent assault against a non-Indian in the same neighborhood.

On September 12, 1987, two students from Stevens Institute of Technology, Vikas Aggarwal, a graduate student, and Syed Hasan, a freshman, were assaulted outside the East L.A. Restaurant in Hoboken by a group of Puerto Rican teenagers. Aggarwal was hit with a baseball bat during the assault, sustaining injuries that required stitches. Hasan was bruised in several places, which required that he carry his arm in a sling. Included in the group of attackers were Luis and William Acevedo.

After the attack outside the restaurant the Indian students were taken to St. Mary's hospital. Following their treatment at the hospital, they gave a statement to the Hoboken police concerning the incident, indicating their desire to press charges against their attackers. They could not, however, identify their attackers during their visit with the police.

After some investigative work, Detective Cahill of the Hoboken police department discovered that the Acevedo brothers were involved in the assault against the students, learning from informants that the two brothers had been heard around town boasting that they had beaten up two Indians and a man who attempted to assist them. Hearing that the police wanted to speak with them, the Acevedo brothers entered the police station on September 17, 1987 in an attempt to resolve the charges against them. Detective Cahill claims that during this visit he called one of the Indian students and the person who had tried to assist the students during the assault, inquiring as to whether they intended to file a criminal complaint against the Acevedo brothers. Although Detective Cahill claims that someone representing himself as Hasan told him that neither he nor Aggarwal wanted to press charges against the Acevedo brothers, Aggarwal and Hasan deny receiving a call from Detective Cahill or telling the Hoboken police anything other than that they were fully prepared to press charges against the assailants.[1] The Hoboken police department did not file criminal complaints against the Acevedo brothers. On September 27, 1987, the Acevedo brothers were involved in the incident which resulted in Mr. Mody's death.

## LEGAL DISCUSSION

### I. *Summary Judgment*

In order for a party to prevail on a motion for summary judgment pursuant to Fed.R.Civ.P. 56, it must show that there are no genuine issues of material fact and that, viewing the facts in the light most favorable to the nonmoving party, it will prevail on its claims as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must look to and follow the substantive law concerning section 1983 to identify which facts in this case are material.

---

1. Aggarwal does admit in his deposition testimony that he was not aware that he had to take further action in addition to giving a statement to the police to press criminal charges against an individual. However, both students contend that they never indicated that they were unwilling to cooperate with the police in filing criminal charges against their assailants.

*Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. at 2510.

## II. *Section 1983*

42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

To establish a cause of action under section 1983, a plaintiff must allege deprivation of a federal right by a person acting under color of state law. *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 1923–24, 64 L.Ed.2d 572 (1980).

The Supreme Court has held that liability may be imposed against a municipality under section 1983 "[where] ... the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Department of Social Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978). The court has also declared that "local governments ... may be sued for constitutional deprivations visited pursuant to governmental custom even though such custom has not received formal approval through the body's official decision-making channels." *Id.* at 690–91, 98 S.Ct. at 2036.

In order to impose liability on a municipality, the Third Circuit in *Losch v. Borough of Parkesburg, Pennsylvania,* 736 F.2d 903 (1984) stated that "[a] plaintiff must identify the challenged policy, attribute it to the city itself, and show a causal link between execution of the policy and the injury suffered." *Id.* at 911. "In an appropriate case", declared the court in *Estate of Bailey by Oare v. County of York,* "even in the absence of formal agency conduct, an official policy may be inferred from informal acts or omissions of supervisory municipal officials." *Estate of Bailey by Oare v. County of York,* 768 F.2d 503, 506 (1985), *quoting, Turpin v. Mailet,* 619 F.2d 196, 200 (2d Cir.), *cert. denied,* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980). The *Estate of Bailey* court also established that a section 1983 claim against a municipality may be asserted by alleging "conduct rising to the level of deliberate indifference, reckless disregard, or gross negligence by the agency and its supervisory officials fairly attributable to policies and practices of the agency." *Estate of Bailey,* 768 F.2d at 508.

### *Due Process Claim*

■ Defendants argue that plaintiff has failed to state a claim under section 1983 because the decedent in this case did not have a constitutional right to police protection under the Supreme Court's decision in *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). *DeShaney* interpreted the due process clause of the fourteenth amendment, rejecting an argument that the government has an affirmative duty to protect private individuals from private violence:

Nothing in the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's powers to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means. *Id.* at 195, 109 S.Ct. at 1003.

Absent a "special relationship" between decedent and the municipality, which does not exist in this case, plaintiff may not claim that defendants violated decedent's constitutional rights under the due process clause of the fourteenth amendment. *See DeShaney,* 489 U.S. at 194, 109 S.Ct. at 1002.

### Equal Protection Claim

■ Although the Supreme Court's decision in *DeShaney* forecloses any claim that the Hoboken police owed an affirmative duty to protect decedent under the due process clause of the fourteenth amendment, plaintiff asserts a section 1983 action under the equal protection clause of the fourteenth amendment.[2] In *DeShaney,* the Supreme Court noted that "[t]he [s]tate may not ... selectively deny its protective services to certain disfavored minorities without violating the equal protection clause." *Id.* at 197, n. 3, 109 S.Ct. at 1004, n. 3; *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). If plaintiff is to survive defendants' summary judgment motion, this court must conclude that the facts alleged in this suit support an equal protection claim under section 1983.

Plaintiff essentially claims that defendants discriminated against decedent by promulgating a policy of inaction respecting violence against Indians. Pursuant to this policy, according to plaintiff, defendants refused to file criminal complaints against people who had engaged in attacks against Indians, sending a message to the larger community that if they committed violent acts against Indians they would not be held accountable for their actions. Plaintiff claims that, like the many state officials who, out of racial animus, re-frained from prosecuting private perpetrators of violence against blacks prior to the enactment of section 1983, the Hoboken police tacitly encouraged the violence against decedent by implicitly proclaiming to his future attackers that they would not be prosecuted for any violence committed against him. Just as plaintiff would have made out a viable cause of action under section 1983 if he had plead that the Hoboken police department expressly and publicly announced that it would not as a policy matter apprehend or file criminal complaints against any perpetrators of violence against Indians, so too could a jury infer from the facts stated by plaintiff that the Hoboken police implicitly conveyed this message by not detaining or filing criminal complaints against those who attacked Indians. As the survivor of an Indian who was allegedly injured by the implied policy, plaintiff asserts a viable cause of action against defendants.[3]

If plaintiff's allegations are true, as viewed at this stage in a favorable light, then the defendants' actions are precisely the type of actions that motivated Congress to pass section 1983 in the first instance. *See Hawk v. Perillo,* 642 F.Supp. 380 (N.D.Ill.1985). In *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), the Supreme Court, after reviewing the legislative history of section 1983, noted that "[i]t was not the unavailability of state remedies but the failure of certain states to enforce the laws with an equal hand that furnished the powerful momentum behind this ... bill." *Id.* at 174–75, 81 S.Ct. at 477.

Determining that plaintiff asserts a viable cause of action under section 1983 does

---

**2.** In his complaint, plaintiff alleges that "acting under color of state law, pursuant to a policy and practice and with the authority of the [d]efendant city of Hoboken, the [d]efendants, Kiely, Cahill and Crimmins, intentionally, negligently and with complete and deliberate indifference for decedent's rights caused the decedent to be deprived of his constitutional rights by failing to properly and adequately provide for the safety of minority residents despite knowledge of the danger they were exposed to in the community." Plaintiff's Complaint, Count 1, ¶ 25.

**3.** Indians are a protected class under the equal protection clause of the fourteenth amendment. Plaintiff's standing in this suit stems from decedent's position as a victim of the city of Hoboken's allegedly discriminatory policy of not prosecuting perpetrators of violence against Indians. *See Arlington Heights v. Metropolitan Housing Co.,* 429 U.S. 252, 264, 97 S.Ct. 555, 562–63, 50 L.Ed.2d 450 (1977) (establishing the standing of a black victim of a municipality's allegedly discriminatory zoning practices).

not end this court's analysis. When a defendant moves for summary judgment, pursuant to Fed.R.Civ.P. 56, the plaintiff must introduce evidence beyond the mere pleadings to create an issue of material fact on "an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

A plaintiff in an equal protection action has the burden of demonstrating discriminatory intent. *Arlington Heights v. Metropolitan Housing Co.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). A plaintiff does not have to demonstrate that the challenged policy was taken solely for discriminatory purposes; it is necessary only to show that a discriminatory purpose was a motivating factor. *Id.* "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available", declared the Supreme Court in *Arlington Heights. Id.* at 266, 97 S.Ct. at 563–64. Evidence which a court may consider includes but is not limited to "the impact of the official action", "the historical background of the decision ..., particularly if it reveals a series of official actions taken for invidious purposes", "the specific sequence of events leading up to the challenged decision", "departures from normal procedural sequence", and "[s]ubstantial departures [from normal procedure] ..., particularly if the factors usually considered important by the decision-maker strongly favor a decision contrary to the one reached." *Id.* at 266–67, 97 S.Ct. at 564.

Construing the facts in the light most favorable to plaintiff and considering the evidence that plaintiff has asserted in support of his claim, this court concludes that summary judgment should not be granted as against plaintiff. Plaintiff has presented evidence from which a reasonable jury could find that defendants, by not detaining or filing criminal complaints against those who attacked Indians, intentionally discriminated against Indians, and that the city of Hoboken engaged in a custom or practice of discrimination against Indians.

Plaintiff has presented evidence that individuals in the community at large sensed a "lack of interest" by the Hoboken Police Department in crimes committed against Indians. Van Schaick Dep., p. 29, 62. Plaintiff has also suggested that the Hoboken police did not respond properly or promptly to other incidents in the neighborhood in which the fifty Indian families reside, including an attack by Puerto Rican youths against Indians at 815 Park Avenue. Moreover, plaintiff's evidence suggests that Lieutenant Kiely and/or Detective Cahill attempted to forge police reports to make it appear as though police officials had not been negligent in their investigation and follow-up of the assault on the Indian students. Van Schaick Dep., p. 30.

Detective Cahill's own deposition testimony suggests that he failed to adhere to proper police procedure during the investigation of the assault on the Indian students. In explaining why no criminal complaint was filed against the Acevedo brothers, Detective Cahill related a conversation between him and Hasan in which Hasan purportedly acknowledged that he was the roommate of Aggarwal. Cahill Dep., p. 37. In fact, the Indian students were never roommates and Hasan denies ever receiving the phone call.

While not attributing the police department's failure to file a criminal complaint against the students' attackers to intentional discrimination against Indians, John Jay College Professor Matthew Healy's report on the incident states:

> In my opinion, the handling of this case by Detective Cahill was inappropriate, deficient below generally accepted standards for this type of police activity ... In my opinion, also the handling of this case reflects poorly on the quality of supervision on the part of whichever superior officers were responsible for reading and approving these reports and the actions of Detective Cahill. They accepted sub-standard work and inappropriate procedures by Cahill without correcting and changing his actions, thereby allowing Luis and William Acevedo to remain

on the streets and bring about the subsequent death of Navroze Mody.

Finally, defendants' suggestion that no causal relationship exists between defendants' conduct and the decedent's death fails. It is for a jury to determine the probable effect a criminal complaint and investigation would have had upon the Acevedo brothers. This court cannot conclude as a matter of law that more responsive action by the police department would not have discouraged the Acevedo brothers from attacking the decedent. *See Black v. Stephens*, 662 F.2d 181, 190–91 (3d Cir. 1981), *cert. denied*, 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982); *Rizzo v. Goode*, 423 U.S. 362, 371, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976). A jury may well find that the failure to take action against the Acevedo brothers encouraged the assault upon Mr. Mody.

Based on the foregoing discussion, the court holds that a reasonable jury could conclude from plaintiff's evidence that the defendants discriminated against Indians, that the Hoboken police department tolerated, acquiesced in, or generally condoned a pattern, custom or practice of discriminating against Indians, and that this discrimination proximately caused decedent's death.

### III. *"Good Faith" Qualified Immunity*

■ The Third Circuit in *Losch* stated that "[q]ualified immunity protects a defendant who failed to observe a right or legal standard that was not clearly established when the defendant acted." *Losch*, 736 F.2d at 909. Defendants assert such qualified immunity against plaintiff's claims in this case. Yet, because plaintiff's section 1983 claim is based on a theory of intentional discrimination, defendants are not entitled to "good faith" immunity. While "good faith" immunity may apply in cases where discrimination arises from the application of a neutral policy, *See Brown v. Grabowski*, 922 F.2d 1097 (3d Cir.1991); *Hynson v. City of Chester Legal Dept.*, 864 F.2d 1026, 1032, no such immunity exists against a claim of intentional discrimination. See *Goodwin v. Circuit Court of*

*St. Louis County*, 729 F.2d 541 (8th Cir. 1984).

### IV. *Section 1985*

■ Section 1985(3) creates a cause of action for damages for conspiracies which deprive persons of the equal protection of law or other federal rights, privileges and immunities. To recover damages under section 1985(3), a plaintiff must establish that there was "some racial, or perhaps other-wise class-based, invidiously discriminatory animus behind the conspirators' action," *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), and that some act committed in furtherance of a conspiracy caused an injury to plaintiff's person or property, or deprivation of any right or privilege of a United States citizen. *Id.* at 102, 91 S.Ct. at 1798. Based upon the discussion above as it relates to section 1983, this court concludes that defendants are not entitled to summary judgment on plaintiff's section 1985(3) claim. A reasonable jury could conclude from plaintiff's evidence that the defendants entered into a conspiracy to discriminate against decedent in violation of section 1985(3).

### V. *Common Law or Statutory Tort Claims*

Defendants have argued that they are immune from tort liability under several provisions of the New Jersey Tort Claims Act. Because plaintiff has represented that his action against defendants is a federal cause of action to which the New Jersey Tort Claims Act does not apply,[4] this opinion does not resolve whether plaintiff has a cause of action under the New Jersey Tort Claims Act or any state law tort theory.

### CONCLUSION

For the foregoing reasons, this court denies defendants' motion for summary judgment.

---

4. Plaintiff's brief in opposition to Defendants' motion for summary judgment, at 13.